# In the United States Court of Federal Claims

No. 14-282 C
Filed: June 4, 2015

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | |
|---|---|
| CYNTHIA G. NUTT *et al.*, | Breach of Contract; |
| Plaintiffs, | Federal Tort Claims Act, |
| | 28 U.S.C. § 2671 *et seq.*; |
| v. | Military Claims Act, |
| | 10 U.S.C. § 2731 *et seq.*; |
| THE UNITED STATES, | Summary Judgment, |
| | RCFC 56. |
| Defendant. | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**Andrew J. Maloney, III**, Kriendler & Kriendler, LLP, New York, N.Y., Counsel for Plaintiffs.

**Ryan M. Majerus**, United States Department of Justice, Civil Division, Washington, D.C., Counsel for the Government.

## MEMORANDUM OPINION AND FINAL ORDER

**BRADEN**, *Judge*.

## I.   RELEVANT FACTUAL BACKGROUND.[1]

On September 27, 1983, James Nutt, Sr. was killed when his vehicle was struck by a United States Army truck driven by a drunk Army employee.  Am. Compl. ¶ 1.  James Nutt, Sr. was survived by his wife and son, Cynthia Nutt and James Nutt, Jr.  Am. Compl. ¶ 3.

On February 23, 1984, Plaintiffs filed a Form 95 Notice Of Claim, "pursuant to the Federal Tort Claims Act, 28 U.S.C. § 2671."  Am. Compl. ¶ 2; *see also* Pl. Ex. A.

---

[1] The relevant facts discussed herein were derived from: the Exhibits attached to Plaintiffs' April 11, 2014 Complaint ("Pl. Exs. A–E"); Plaintiffs' April 30, 2014 Amended Complaint ("Am. Compl."); Plaintiffs' November 13, 2014 Motion For Partial Summary Judgment On Liability ("Pl. Mot."); and the Government's December 9, 2014 Cross-Motion For Partial Summary Judgment ("Gov't Mot.") and the Appendix attached thereto ("Gov't App'x 1–58").

On June 28, 1985, Plaintiffs and the Government entered into a settlement agreement ("Agreement") that stated, in relevant part:

As soon as practicable after approval of this settlement, the United States agrees to purchase annuities which will pay the following amounts:

[$60,000 per year] to Cynthia G. Nutt, her estate or designated beneficiary for as long as [she] shall live or for thirty (30) years, whichever is later.

On each of the following anniversaries of the purchase of the annuity, the following specified lump sum payments shall be paid to Cynthia G. Nutt, her estate or designated beneficiary:

| Anniversary | Amount |
|---|---|
| Fifth | $100,000.00 |
| Tenth | $125,000.00 |
| Fifteenth | $150,000.00 |
| Twentieth | $175,000.00 |
| Twenty-fifth | $200,000.00 |
| Thirtieth | $225,000.00 |

On each of the following anniversaries of the purchase of the annuity, the following specified lump sum payments shall be paid to James N. Nutt, Jr., his guardian, his estate or designated beneficiary.

| Anniversary | Amount |
|---|---|
| Thirteenth | $25,000.00 |
| Fourteenth | $25,000.00 |
| Fifteenth | $25,000.00 |
| Sixteenth | $25,000.00 |
| Seventeenth | $40,000.00 |
| Eighteenth | $40,000.00 |
| Nineteenth | $40,000.00 |
| Twentieth | $100,000.00 |
| Twenty-fifth | $150,000.00 |
| Thirtieth | $150,000.00 |
| Thirty-fifth | $200,000.00 |
| Fortieth | $200,000.00 |
| Forty-fifth | $200,000.00 |
| Fiftieth | $1,000,000.00 |
| Fifty-fifth | $1,000,000.00 |

***

The payments by the United States set forth above shall operate as full and complete discharge of all payments to be made to and of all claims which might be asserted on behalf of [Plaintiffs], their heirs and personal representatives, and

2

any other persons whomsoever may assert a claim, provided, however, that if the insurance company hereinaf[t]er referred to defaults in the performance of its obligations under the annuity agreement with the United States, [Plaintiffs], their heirs or personal representatives as third party beneficiary shall have standing to sue the said insurance company for breach of contract.  In such event, the United States shall assist [Plaintiffs], their heirs or personal representatives, in the prosecution of said suit to the extent permitted by applicable laws and regulations.

The United States represents to [Plaintiffs] that the insurance company it selects for the purchase of the annuities will be one which is generally regarded as very sound in the insurance industry and to be among the class or group of insurance companies which are rated Excellent or better by Best's Guide to Life Insurance Companies, 1982 Edition, published by A. M. Best Company, Oldwick, New Jersey 07830.

[Plaintiffs] agree by this Settlement Agreement to reimburse and/or indemnify and hold harmless the United States, its agents, servants and employees from any and all causes of action, claims, liens, rights or subrogated interests of whatever nature arising from the incident noted above.

Pl. Ex. B at 1–3.

On July 2, 1985, the Probate Court of Miller County, Arkansas approved the Agreement. Pl. Ex. C.

On July 12 1985, the Government purchased a structured annuity from Executive Life Insurance Company of New York ("ELNY") through a broker, JMW Settlements, Inc.  Am. Compl. ¶ 5; see also Gov't App'x at 45.

On April 23, 1991, ELNY went into receivership.  Am. Compl. ¶ 6.

On December 7, 2011, the New York State Liquidation Bureau sent Plaintiffs a letter explaining the liquidation of ELNY receivership assets and stating, "[d]ue to the liquidation, at this time it is anticipated that the amount of your benefit payments will ultimately be reduced." Pl. Ex. D at 1.   Under ELNY's liquidation and restructuring, Plaintiffs would receive an estimated 45% of their expected benefits.  Pl. Ex. E.  But see Am. Compl. ¶ 6 ("Consequently[,] Mrs. Nutt would receive only an estimated 45% of her remaining annuity[,] and her son James Jr. would receive only 41% of his remaining annuity.").  Plaintiffs received full payments until August 8, 2013.  Am. Compl. ¶ 6.

In 2011, 2012, and 2013, "Plaintiffs contacted the U.S. Army tort claims personnel and structured annuity division . . . to demand they cover any shortfalls.  Neither the Army nor Justice Department provided a meaningful response."  Am. Compl. ¶ 6.

On August 8, 2013, "[P]laintiff's scheduled payments were cut to approximately 45%[.]" Am. Compl. ¶ 6.  "Mrs. Nutt has not received 59% of the monthly payments owed to her since August 8, 2013[.]"  Am. Compl. ¶ 7.  "Plaintiffs have been advised that Ms. Nutt will not receive

the Thirtieth lump sum payment of $225,000 due to her on July 12, 2015." Am. Compl. ¶ 8. "Plaintiffs have further been advised that James N. Nutt, Jr. will not receive his [future lump sum payments]." Am. Compl. ¶ 9.

## II.    PROCEDURAL HISTORY.

On April 11, 2014, Cynthia Nutt and James Nutt, Jr. ("Plaintiffs") filed a Complaint in the United States Court of Federal Claims ("Compl."). On April 30, 2014, Plaintiffs filed an Amended Complaint ("Am. Compl.").

On August 8, 2014, the Government filed an Answer.

On November 13, 2014, Plaintiffs filed a Motion For Partial Summary Judgment On Liability ("Pl. Mot."). On December 9, 2014, the Government filed a Response & Cross-Motion ("Gov't Mot."). On January 15, 2015, Plaintiffs filed a Reply & Response ("Pl. Reply"). On February 12, 2015, the Government filed a Reply ("Gov't Reply").

On April 7, 2015, Plaintiff filed a Notice advising the court of an April 1, 2015 opinion by another judge on the United States Court of Federal Claims in a similar case, *Stathis v. United States*, No. 14-61, 2015 WL 1537542 (Fed. Cl. Apr. 1, 2015).

## III.    DISCUSSION.

### A.    Jurisdiction.

The United States Court of Federal Claims has jurisdiction under the Tucker Act, 28 U.S.C. § 1491, "to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a)(1). The Tucker Act, however, is "a jurisdictional statute; it does not create any substantive right enforceable against the United States for money damages . . . . [T]he Act merely confers jurisdiction upon [the United States Court of Federal Claims] whenever the substantive right exists." *United States v. Testan*, 424 U.S. 392, 398 (1976).

To pursue a substantive right under the Tucker Act, a plaintiff must identify and plead an independent contractual relationship, Constitutional provision, federal statute, and/or executive agency regulation that provides a substantive right to money damages. *See Todd v. United States*, 386 F.3d 1091, 1094 (Fed. Cir. 2004) ("[J]urisdiction under the Tucker Act requires the litigant to identify a substantive right for money damages against the United States separate from the Tucker Act[.]"); *see also Fisher v. United States*, 402 F.3d 1167, 1172 (Fed. Cir. 2005) (*en banc*) ("The Tucker Act . . . does not create a substantive cause of action; . . . a plaintiff must identify a separate source of substantive law that creates the right to money damages. . . . [T]hat source must be 'money-mandating.'"). Specifically, a plaintiff must demonstrate that the source of substantive law upon which he relies "can fairly be interpreted as mandating compensation by the Federal Government[.]" *Testan*, 424 U.S. at 400. And, the plaintiff bears the burden of establishing jurisdiction by a preponderance of the evidence. *See Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 748 (Fed. Cir. 1988) ("[O]nce the [trial] court's subject matter

jurisdiction [is] put in question . . . . [the plaintiff] bears the burden of establishing subject matter jurisdiction by a preponderance of the evidence.").

"[W]hen viewed simply as a contract, a breach of a settlement agreement involving damages of more than $10,000 is within the Tucker Act jurisdiction of the Court of Federal Claims." *VanDesande v. United States*, 673 F.3d 1342, 1346 (Fed. Cir. 2012). Here, Plaintiffs allege violation of the Agreement involving damages over $10,000. *See* Am. Compl. ¶ 17. Thus, the court has jurisdiction to adjudicate Plaintiffs' claims.

### B.  Standing.

The United States Supreme Court has held that "the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues." *Warth v. Seldin,* 422 U.S. 490, 498 (1975).  Standing must be determined "as of the commencement of suit." *Rothe Dev. Corp. v. Dep't of Def.*, 413 F.3d 1327, 1334 (Fed. Cir. 2005).  "The party invoking federal jurisdiction bears the burden of establishing [the three] elements [of standing]." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).  Specifically, "a plaintiff must show [that] it has suffered an 'injury in fact' that is . . . concrete and particularized and . . . actual or imminent, not conjectural or hypothetical; . . . the injury is fairly traceable to the challenged action of the defendant; and . . . it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Envtl. Serv., Inc.*, 528 U.S. 167, 180–81 (2000) (citations omitted).

The April 30, 2014 Amended Complaint alleges that Plaintiffs have suffered an "injury in fact" that is concrete and particularized, actual, and fairly traceable to the Government's failure "to pay [P]laintiffs' scheduled annuity payments" and refusal "to pay future periodic and lump sum payments pursuant to the terms of the . . . Agreement." Am. Compl. ¶ 16.  Accordingly, Plaintiffs have established standing to seek an adjudication of the claims alleged in the April 30, 2014 Amended Complaint.

### C.  Standard Of Review For Summary Judgment.

On a motion for summary judgment, the moving party must establish that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *See Amergen Energy Co. ex rel. Exelon Generation Co. v. United States*, 779 F.3d 1368, 1372 (Fed. Cir. 2015) (quoting Rule 56(c) of the Rules of the United States Court of Federal Claims ("RCFC")) ("Summary judgment is appropriate when, drawing all justifiable inferences in the nonmovant's favor, 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'").  Only genuine disputes of material fact that might affect the outcome of the suit preclude entry of summary judgment. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("As to materiality, the substantive law will identify which facts are material.  Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.  Factual disputes that are irrelevant or unnecessary will not be counted.").  The "existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Id.* at 247–48 (emphasis in original).  "[C]ourts are required to view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the [summary

judgment] motion.'"   *Scott v. Harris*, 550 U.S. 372, 378 (2007) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)).

### D.   Plaintiffs' Argument.

Plaintiffs argue that "[t]he sole issue on summary judgment is whether the Government breached its contract with Plaintiffs by failing to make the future payments it promised to Plaintiffs in exchange for settlement of their claims[.]"  Pl. Mot. at 4.  "[T]he Government was not absolved from the terms of the . . . Agreement when it purchased the ENLY annuity."  Pl. Mot. at 5.  The "Agreement states that the future payments 'shall be paid' thereby rendering the future payments mandatory[.]"  Pl. Mot. at 5.

This case is analogous to *Massie v. United States*, 166 F.3d 1184 (Fed. Cir. 1999) and *Hendrickson v. United States*, No. 83-CV-621, 2014 WL 2112575 (W.D.N.Y. May 20, 2014).  In *Massie*, the United States Court of Appeals for the Federal Circuit held:

> The language specifying that the annuity "will result in distributions" and that the disbursements "shall be paid" is unambiguously mandatory and says unequivocally that the [plaintiffs] must receive the payments. . . .  Because the payments are mandatory, the [G]overnment must be responsible for their payment; no one else is a party to the Agreement.  Although the [G]overnment may delegate its duties under the Agreement to another entity, such as [ELNY], this delegation does not absolve it of its obligations.

*Massie*, 166 F.3d at 1190.  This case mirrors *Massie*, because both cases involve the Military Claims Act ("MCA").  Pl. Resp. at 3.

Similarly in *Hendrickson*, the United States District Court for the Western District of New York determined that:

> The Government agreed to settle this case by paying an initial lump sum, and making future payments.  It chose to fund those payments with the purchase of an annuity.  That ELNY, the provider of the annuity, can no longer make the total payments owed by the defendant to the plaintiffs is not a burden to be borne by the plaintiffs.  It is the Government's promise, and it is the Government's responsibility to meet that promise.

*Hendrickson*, 2014 WL 2112575, at *6.

Plaintiffs contend that "both [*Massie* and *Hendrickson*] dealt with tort settlements . . . wherein the Government voluntarily agreed to make monthly payments along with larger periodic payments as part of the individual settlements."  Pl. Mot. at 6.  "To save money, the Government purchased annuities from ELNY.  However, once ELNY was no longer able to

make the promised payments[,] the courts held it was the Government's responsibility to meet its original obligation." Pl. Mot. at 6.[2]

      E.      **The Government's Argument.**

      The Government responds that there are five reasons the Agreement only required the Government to purchase the annuity, not to guarantee ELNY's future payments.

      First, "Plaintiffs' interpretation of the [Agreement] cannot be correct because the . . . Department of Justice official with authority at the time to settle this case . . . authorized a structured settlement 'not to exceed $1,601,978.00[.]'" Gov't Mot. at 9; *see also* Gov't App'x at 5 (June 25, 1985 Memorandum). If the Army's representative had attempted to settle the case for more than $1,601,978.00, the Agreement would have been unenforceable. *See White v. Dep't of Interior*, 639 F. Supp. 82, 88 (M.D. Pa. 1986) (holding that a settlement agreement was unenforceable when it had not been authorized by a United States official with requisite authority). Thus, adopting Plaintiffs' interpretation renders the Agreement unenforceable. Gov't Mot. at 10.

      Second, "[t]he [Federal Tort Claims Act ("FTCA")] is a limited waiver of the Government's sovereign immunity" and only allows federal courts to award "money damages." Gov't Mot. at 11 (citing 28 U.S.C. § 1346(b)(1)[3]). "Money damages" must be in "lump sum"

---

    [2] Plaintiffs also distinguish *Linebarger v. United States*, 927 F. Supp. 1280 (N.D. Cal. 1996). Pl. Mot. at 7. In *Linebarger*, "the Government did not retain ownership of the [plaintiff's] annuity after its purchase"; thus, the Government was not obligated to guarantee future payments. Pl. Mot. at 7. But, in this case, the Government did retain ownership of the annuity; thus, it is obligated to guarantee future payments. Pl. Mot. at 7; *see also Hendrickson*, 2014 WL 2112575, at *7 ("*Linebarger*, however, is significantly different from [*Hendrickson*] in that . . . the Settlement Agreement specifically provided that the United States retained ownership of the annuity[.]"). The plaintiffs in *Linebarger* "were free to negotiate the terms of the agreement including the choice of an annuity company," but Plaintiffs in this case "were forced to use ELNY." Pl. Mot. at 8. Finally, Plaintiffs contend that *Linebarger* "misapprehended the law completely on the Government's ability to enter into an agreement with bargained for future payments," even though "the Government routinely enters into structured settlements." Pl. Mot. at 8.

    [3] Section 1346(b)(1) provides:

    Subject to the provisions of chapter 171 of this title, the district courts . . . shall have exclusive jurisdiction of civil actions on claims against the United States, for money damages, accruing on and after January 1, 1945, for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his

form.  Gov't Mot. at 11 (citing *Frankel v. Heym*, 466 F.2d 1226, 1228–29 (3d Cir. 1972) ("[A] district court should not make other than lump-sum money judgments unless and until Congress shall authorize a different type of award.")).  "As a result, no court has jurisdiction to order the United States to pay future damages by way of periodic payments or to order the United States to purchase annuities to pay future periodic payments absent specific statutory authority."  Gov't Mot. at 11.  The FTCA requires settlements to "be final and conclusive and be paid only in a matter similar to judgments in like causes."  Gov't Mot. at 12 (citing 28 U.S.C. § 2672[4]).  Executive agencies are bound by congressional oversight of appropriated funds, including FTCA settlements; therefore, agencies cannot agree to unfixed or unascertained settlements.  *See* 28 U.S.C. § 2672; *see also* B-162924, 1967 WL 2339, at *1 (Comp. Gen. Dec. 22, 1967) ("We find no reason to object to any manner of compromise settlement . . . in a fixed reasonable amount.").  "Thus, because of the restrictions placed on the [Government] in FTCA actions, it does not and cannot act as the guarantor for future, periodic annuity payments under the terms of the [Agreement]."  Gov't Mot. at 16 (citing *Hercules Inc. v. United States*, 516 U.S. 417, 426–27 (1996) (holding that the contracting officer did not and would not have agreed to open-ended indemnification)).

Third, "the terms of the . . . [A]greement . . . are consistent with the limitations on the United States' authority regarding FTCA settlements."  Gov't Mot. at 17.  The Agreement "states that the 'United States of America agrees to purchase annuities which will pay' future sums[.]"  Gov't Mot. at 17 (quoting Gov't App'x at 1 (Agreement)).  Plaintiffs focus on the

---

office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

28 U.S.C. § 1346(b)(1).

[4] Section 2672, in relevant part, provides:

Subject to the provisions of this title relating to civil actions on tort claims against the United States, any such award, compromise, settlement, or determination shall be final and conclusive on all officers of the Government, except when procured by means of fraud.

Any award, compromise, or settlement in an amount of $2,500 or less made pursuant to this section shall be paid by the head of the Federal agency concerned out of appropriations available to that agency. Payment of any award, compromise, or settlement in an amount in excess of $2,500 made pursuant to this section or made by the Attorney General in any amount pursuant to section 2677 of this title shall be paid in a manner similar to judgments and compromises in like causes and appropriations or funds available for the payment of such judgments and compromises are hereby made available for the payment of awards, compromises, or settlements under this chapter.

28 U.S.C. § 2672.

language of the Agreement stating that "[t]he payments by the United States set forth above shall operate as a full and complete discharge[.]" Gov't App'x at 3. But, "[t]he only reasonable interpretation of this provision is that the 'payments' that will 'operate as full and complete discharge' are those payments made to *purchase* the annuity, which upon purchase, satisfied the Government's obligation to all payments that the [A]greement expressly provided would 'be satisfied[.]'" Gov't Mot. at 18 (emphasis in original). The Agreement provided that "[t]he United States will furnish to [Plaintiffs] . . . evidence of the *purchase* by the United States of annuities in an amount sufficient to satisfy those obligations of the United States under th[e] . . . Agreement which are to be satisfied by the purchase of the annuities." Gov't App'x at 3. The Agreement does not provide that the Government would guarantee future payments. Gov't Mot. at 18. Plaintiffs understood this to be the case, because correspondence between the parties' counsel in 1985 and 1986 "indicates that the [P]laintiffs' counsel intended to 'reinsure' the annuity contracts"—an unnecessary step if the Government guaranteed the payments. Gov't Mot. at 18; *see also* Gov't App'x at 55–56 (September 6, 1985 and February 3, 1986 correspondence from Plaintiffs' counsel to JMW Settlements, Inc.).

The Agreement also provides that, if the insurance company fails to make annuity payments, Plaintiffs have standing to sue the insurance company "for breach of contract," and that "the [Government] shall assist [Plaintiffs], their heirs or personal representatives, in the prosecution of said suit[.]" Gov't App'x at 3. "This provision would be nonsensical if, in fact, the Government itself served as guarantor of all payments." Gov't Mot. at 19. Moreover, the Agreement requires the Government to select an insurance company that is "generally regarded as very sound in the insurance industry" and "rated Excellent or better[.]" Gov't App'x at 3. "If the [Government were] responsible for ensuring the amount of the periodic distributions, there would have been no need for the agreement to specify that the company providing the annuity be of a particular quality." Gov't Mot. at 20.

Fourth, "Plaintiffs take the words 'shall' and 'will' out of context in the [Agreement]." Gov't Mot. at 21. In their proper context, these words "simply describe the annuity to be purchased[.]" Gov't Mot. at 21. The same is true of the phrase "shall be paid": "the United States is not even mentioned in the paragraphs in which these words appear." Gov't Mot. at 22 (citing Gov't App'x at 1–3). Adopting Plaintiffs' interpretation "would fundamentally alter the benefit of the bargain . . . and add a term requiring the Government to insure or guarantee the solvency of the annuity issuer, a term to which the [Government] plainly did not (and could not) agree." Gov't Mot. at 22–23; *see also Linebarger*, 927 F. Supp. 1280, 1282 (N.D. Cal. 1996) ("Under the FTCA the United States could not have entered an agreement in which it was required to make periodic payments over twenty years. . . . Plaintiff essentially argues that, under the terms of the settlement agreement, the [G]overnment was required to see that each payment was made and if not pay that amount itself. . . . Such an agreement is plainly prohibited under the FTCA.").[5]

---

[5] The Government also argues that, "[c]ontrary to [P]laintiffs' assertions, the district court in *Linebarger* did not rely on [the] lack of [the Government's] ownership [of the annuity] as the reason why the Government was not obligated to guarantee future payments. Rather, the court correctly held that the Government cannot guarantee to make future, periodic payments under the FTCA." Gov't Mot. at 24 n.6.

Fifth, "*Massie* is distinguishable because that case involved a claim filed pursuant to the [MCA]. Thus, *Massie* did not address the limitations on the [Government] in FTCA settlements[.]" Gov't Mot. at 26. "The distinction between the MCA and the FTCA is crucial, because the MCA, 10 U.S.C. §§ 2731–2739, is not a waiver of the Government's sovereign immunity." Gov't Mot. at 27 (citing *Tobar v. United States*, 639 F.3d 1191, 1196 (9th Cir. 2011) ("The [MCA] does not mention, and therefore does not waive, sovereign immunity.")). "There is also no 'claim' for a plaintiff to release in MCA cases because a claimant has no right to litigate a MCA claim—the Secretary's decision to pay is discretionary and not subject to review." Gov't Mot. at 27. *Massie* does not control, because it adjudicated an MCA claim, not an FTCA claim. Gov't Mot. at 27–28.

## F. The Court's Resolution.

As an initial matter, the court must determine whether *Massie* controls this case. *Massie* construed an MCA claim. *See Massie*, 166 F.3d at 1186 ("The [plaintiffs] filed a claim with the Department of the Navy pursuant to section 2733 of the Military Claims Act[.]"). Here, Plaintiffs assert that they filed an MCA claim. Pl. Reply at 3 ("[T]his is an MCA claim rather than an FTCA case[.]"). But, this contradicts both Plaintiffs' March 30, 2014 Complaint and February 23, 1984 Form 95 Notice Of Claim. *See* Am. Compl. ¶ 2 ("A Form 95 Notice [O]f Claim was filed pursuant to the Federal Torts Claims Act, 28 U.S.C. § 2671 et seq. against the Department of the . . . Army of the United States on behalf of [P]laintiffs on February 23, 1984."); *see also* Pl. Ex. A (Form 95 Notice Of Claim). Plaintiffs provide no evidence that their claim falls under the MCA. Am. Compl. ¶ 2; Pl. Ex. A (Form 95 Notice Of Claim); Pl. Ex. C, at 1 (July 2, 1985 Probate Order approving "Wrongful Death Compromise Settlement with the United States of America under the Federal Tort Claims Act"). Moreover, only the Secretary of a department can settle an MCA claim; the Deputy Attorney General settles FTCA claims. *Compare* 10 U.S.C. § 2733(a) (granting the Secretary and Judge Advocate General authority to settle MCA claims), *with* 28 U.S.C. § 2672 ("The head of each Federal agency or his designee, in accordance with regulations prescribed by the Attorney General, may . . . settle any claim [under the FTCA.]"). In this case, the Deputy Attorney General settled Plaintiffs' claim. *See* Gov't App'x at 5 (Memorandum to File). The record clearly indicates that Plaintiffs filed an FTCA—not an MCA—claim. As such, *Massie* does not control.

As a matter of law, "[c]ontract terms are given their plain and ordinary meaning, unless the provisions are ambiguous." *Precision Pine & Timber, Inc. v. United States*, 596 F.3d 817, 824 (Fed. Cir. 2010). "A contract provision is only ambiguous if susceptible to more than one reasonable meaning." *Barron Bancshares, Inc. v. United States*, 366 F.3d 1360, 1375–76 (Fed. Cir. 2004). "When the contractual language is unambiguous on its face, [the court's] inquiry ends and the plain language of the Agreement controls." *Coast Fed. Bank, FSB v. United States*, 323 F.3d 1035, 1040–41 (Fed. Cir. 2003). "When interpreting the contract, the document must be considered as a whole and interpreted so as to harmonize and give reasonable meaning to all of its parts." *NVT Techs., Inc. v. United States*, 370 F.3d 1153, 1159 (Fed. Cir. 2004). "An interpretation that gives meaning to all parts of the contract is to be preferred over one that leaves a portion of the contract useless, inexplicable, void, or superfluous." *Id.*

Thus, the court must determine whether the terms of the June 28, 1985 Agreement are unambiguous, such that the court's "inquiry ends at the plain language of the Agreement," or

whether extrinsic evidence should be considered.  *See Coast Fed. Bank*, 323 F.3d at 1040–41. And, to make that determination, the court reads the contract "as a whole" with the intent to "give . . . meaning to all parts of the contract."  *NVT Techs.*, 370 F.3d at 1159.  Here, the Agreement provides that "the United States of America agrees to purchase annuities which will pay [certain periodic amounts.]"  Pl. Ex. B at 1.  The fairest reading of this Agreement provision is that the Government did not agree to pay future sums; it agreed to purchase *annuities*.  The annuities, in turn, "will pay" the future sums.  Pl. Ex. B at 1.  And, after listing the future sums to be paid, the Agreement provides that "[t]he payments by the United States set forth above shall operate as a full and complete discharge[.]"  Pl. Ex. B at 3.

Plaintiffs argue that "payments by the United States" refers to the future sums.  Pl. Mot. at 5–6.  The court must construe "payments by the United States" in context of the whole Agreement—and certainly in context of the whole paragraph.  *See NVT Techs.*, 370 F.3d at 1159. The provisions in the Agreement immediately following the "payments by the United States" favor the Government.  They read:

> The payments by the United States set forth above shall operate as full and complete discharge of all payments to be made to and of all claims which might be asserted on behalf of [Plaintiffs], their heirs and personal representatives, and any other persons whomsoever may assert a claim, provided, however, that if the insurance company hereinaf[t]er referred to defaults in the performance of its obligations under the annuity agreement with the United States, [Plaintiffs], their heirs or personal representatives as third party beneficiary shall have standing to sue the said insurance company for breach of contract.  In such event, the United States shall assist [Plaintiffs], their heirs or personal representatives, in the prosecution of said suit to the extent permitted by applicable laws and regulations.

Pl. Ex. B at 3.

The foregoing paragraph provides that if the insurance company defaults, Plaintiffs have standing to sue the *insurance company*, and the Government agreed to assist Plaintiffs in their lawsuit against the defaulting insurance company.  If "payments by the United States" referred to the future sums, rendering the Government a guarantor of the insurance company, it would not make sense for the Government to agree to assist Plaintiffs in a lawsuit against the insurance company.

Plaintiffs' interpretation also is undercut by the next paragraph of the Agreement:

> The United States represents to [Plaintiffs] that the insurance company it selects for the purchase of the annuities will be one which is generally regarded as very sound in the insurance industry and to be among the class or group of insurance companies which are rated Excellent or better by Best's Guide to Life Insurance Companies, 1982 Edition, published by A. M. Best Company, Oldwick, New Jersey 07830.

Pl. Ex. B at 3.

If the Government acted as a guarantor of the future sums to Plaintiff, it would be unnecessary for the Government to select a "very sound" insurance company "rated Excellent or better." The fact that the Government had to select a "very sound" insurance company implies that Plaintiffs sought to reduce risk by selecting a low-risk annuity instead of requiring the Government act as a guarantor. Plaintiffs do not dispute that ELNY was rated "Excellent or better" in 1985. Therefore, this portion of the Agreement also favors the Government's interpretation.[6]

---

[6] Analogous case law from the United States Court of Federal Claims also weighs in the Government's favor. In *Helmandollar v. United States*, the plaintiffs settled an FTCA claim against the Government. 39 Fed. Cl. 302, 303 (1997). In language similar to the Agreement's language:

> The settlement agreement stated that the . . . [G]overnment would pay to [the] plaintiffs $210,000 in cash initially and would purchase "an annuity from an A+-rated company that will pay directly to [the plaintiffs] . . . or a designated trustee . . . monthly payments of $250.00 for the life of Pamela Helmandollar" and a lump-sum payment every five years over a span of thirty years aggregating $172,900. In return for these payments, [the] plaintiffs released the [G]overnment from their claims.

*Id.* (internal citations omitted). Like this case, the insurance company in *Helmandollar* defaulted, and the plaintiffs sued the Government for breach of contract. *See id.* at 303–04. But, the court dismissed the case, writing:

> Upon examining the settlement agreement as a whole, we conclude that the phrase "will pay" is clearly a description of the type of annuity to be purchased and not a guarantee of the amount of money that is actually paid out by the annuity.

> The only payments guaranteed by the [G]overnment in the settlement were the initial cash payments directly to [the] plaintiffs and their counsel and the initial cash outlay to purchase the annuities. . . . In no way did [the Government] undertake a guarantee of the solvency of the annuity company. . . .

> In interpreting the contract itself, the plain language of the contract controls, and here, the language upon which [the] plaintiffs premise their argument describes the value and nature of the annuity [the Government] was to purchase to fulfill its obligation to [the] plaintiffs, rather than a guarantee that the annuity purchased will faithfully perform over a period of years.

*Id.* at 304 (internal quotation marks and citation omitted).

This case is analogous to *Helmandollar*. As in that case, the Government here agreed only to pay an initial lump sum and purchase an annuity. Pl. Ex. B at 1–3. The Agreement language also stated that the annuity "will pay" future sums to Plaintiffs. The court agrees with

Finally, the court is cognizant that waivers of sovereign immunity must be construed strictly in favor of the sovereign. *See Sossamon v. Texas*, 131 S. Ct. 1651, 1662 (2011) (quoting *Lane v. Pena*, 518 U.S. 187, 192 (1996) ("A waiver of sovereign immunity must be 'strictly construed, in terms of its scope, in favor of the sovereign.'")); *see also United States Dep't of Energy v. Ohio*, 503 U.S. 607, 627 (1992) (recognizing "the requirement that any statement of waiver be unequivocal"). The FTCA is a waiver of sovereign immunity. *See Fed. Dep. Ins. Corp. v. Meyer*, 510 U.S. 471, 475–76 (1994) ("In 1946, Congress passed the FTCA, which waived the sovereign immunity of the United States for certain torts committed by federal employees."). As such, the court must construe the FTCA narrowly. *See Sossamon*, 131 S. Ct. at 1662. This principle further compels a finding that the Agreement did not obligate the

---

*Helmandollar* that "will pay" is "not a guarantee of the amount of money that is actually paid out by the annuity." *Helmandollar*, 39 Fed. Cl. at 304.

The court has considered *Stathis v. United States*, 2015 WL 1537542 (Fed. Cl. Apr. 1, 2015). As a matter of law, decisions of the United States Court of Federal Claims are not binding. *See W. Coast Gen. Corp. v. Dalton*, 39 F.3d 312, 315 (Fed. Cir. 1994) ("Court of Federal Claims decisions, while persuasive, do not set binding precedent for separate and distinct cases in that court."). Although the court in *Stathis* determined that it was bound by *Mathis*, the undersigned judge disagrees. *Mathis*, as an MCA case, did not need to narrowly construe a waiver of sovereign immunity, unlike this case. Moreover, the court in *Stathis* did not explain how the key phrase—"payments by the United States"—fits into the larger context of the contract as a whole. For example, *Stathis* did not explain how the provisions providing for an A+-rated insurer and the Government's assistance in suing the defaulting annuity provider would not be read out of the contract if the Government were the annuity's guarantor. And, *Stathis* did not "strictly construe" sovereign immunity in the Government's favor, because it determined that the Government "arguably ha[s] deferred the waiver of sovereign immunity until the payments are made." 2015 WL 1537542, at *11. Even though the facts of *Stathis* are analogous to those presented here, because of the surrounding language in the Agreement and sovereign immunity concerns, the undersigned judge respectfully declines to follow *Stathis*.

*Hendrickson* also does not persuade otherwise. In *Hendrickson*, the court determined "that the [G]overnment agreed not only to purchase the annuity that would fund [the] plaintiffs' future payments, but also guaranteed that those payments would be made." 2014 WL 2112575, at *6. The court "relied on that portion of the parties' Agreement which provided that [t]he purchase of [the] annuity contracts . . . *and payments thereunder* shall operate as full and complete discharge and satisfaction of the periodic and other payments with respect to the United States of America[.]" *Id.* (emphasis in original) (internal quotation marks omitted). The language emphasized by the *Hendrickson* court in its denial of reconsideration—"and payments thereunder"—is absent from the Agreement here. The *Hendrickson* agreement also provided that "[t]he United States of America shall be obligated to make payment of certain future periodic payments as set forth [in the agreement]." 2014 WL 1224715, at *7. That language also is absent from the Agreement here. The Government never "obligated [itself] to make payment of certain future periodic payments." *Id.* Instead, it "agree[d] to purchase annuities which will pay [certain future sums.]" Pl. Ex. B at 1.

Government to guarantee future payments, because it did not unequivocally promise to do so. *Dep't of Energy*, 503 U.S. at 627.

For these reasons, after reading the June 28, 1985 Agreement, as a whole, the court has determined that the language of the Agreement is unambiguous, and there is no reason to consider extrinsic evidence.  *See Coast Fed. Bank*, 323 F.3d at 1040–41.[7]  Based on the four corners of the Agreement, the court has determined that the Government was obligated to pay certain fixed sums to Plaintiffs and pay for an annuity.  The Government was not obligated to guarantee or insure that annuity; its obligation ended at the initial purchase of the ELNY annuity.

## IV.    CONCLUSION.

For the reasons discussed herein, the Government's December 9, 2014 Cross-Motion For Partial Summary Judgment is **granted**.  Plaintiffs' November 13, 2014 Motion For Partial Summary Judgment is **denied**.  Plaintiffs' April 30, 2014 Amended Complaint is **dismissed**.

**IT IS SO ORDERED.**

s/ Susan G. Braden
**SUSAN G. BRADEN**
**Judge**

---

[7] Even if the court did consider extrinsic evidence, it would support the conclusion that the Government's obligation ended at its purchase of a compliant annuity.  Gov't App'x at 5 (Memorandum to File authorizing a Government representative to settle the case for an amount "not to exceed $1,601,978.00"); *see also* Gov't App'x at 55–57 (correspondence between Plaintiffs' and the Government's counsel discussing reinsuring the annuities, thus demonstrating that the Government was not the guarantor of the annuities).